# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**ROY ELLISON, JR.,**

  Plaintiff,

v.             No. CIV 00-797 BB/WWD-ACE

**SANDIA NATIONAL LABORATORIES,**
**SANDIA CORPORATION,**
**LOCKHEED MARTIN,**

  Defendants.


## OPINION

  **THIS MATTER** comes before the Court on the defendants' motion for summary judgment (Doc. 21, filed September 17, 2001) on the plaintiff's complaint (Doc. 1, filed June 1, 2000), wherein the plaintiff alleges that his former employer discriminated against him because of his age in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq., and in breach of the public policy of the State of New Mexico. The Court has examined the parties' submissions and the relevant legal authorities, and, for the reasons set forth below, finds that the defendants' motion for summary judgment should be **GRANTED**.

## I.
## FACTUAL BACKGROUND

  Plaintiff Roy Ellison, Jr. ("Employee"), began his employment with Defendant Sandia National Laboratories ("Employer") in 1961. (See Employer's opening brief, exhibit A at 4-7, 21.) He continued working for Employer as a Member of Technical Staff ("MTS") until 1973, when he was laid off. Employee returned to Employer in 1976 as an MTS. Pursuant to a laboratory-wide

reclassification project, Employee was reclassified from an MTS to a Senior Member of Technical Staff ("SMTS") in 1989. Throughout all relevant times of his employment, Employee was assigned to the Firing Set, Fuse & Switch Tube Department 2671 ("Department").

In February 1996, Employee met with his supervisor, James W. Hole, for a mid-year review of his work performance for the time period ranging from July 1995 through June 1996. (See Employer's exhibit F.) During that meeting, Mr. Hole advised Employee that he was not progressing at a rate commensurate with his performance expectations. (See Employer's exhibit A at 125.) Employee also was advised at the meeting that his principal assignment was to locate new work outside of the Department because the work he specialized in was no longer in sufficient demand to support his full time effort.

Later that month, Mr. Hole requested that Employer provide retraining for Employee because the Department was funded at 60% of its staffing level and Employee's position was identified as impacted, meaning that there was not enough funding to cover the compensation expended for his position. (See Employer's exhibit C.) There were no suitable SMTS-level projects for Employee in the Department nor in its sister department, the Firing Set & Mechanical Design Department 2674. (See Employer's exhibit E at 10.) As a result, Employee became involved in Sandia Corporation's workforce realignment process. Employee was informed at that time that he needed to look for another position within Sandia Corporation.

In July 1996, Employee met with Mr. Hole for an end-year review of his work performance for the time period ranging from July 1995 through June 1996. (See Employer's exhibit F.) At the meeting, Employee received his annual work performance evaluation, which rated his work performance as Below Performance Expectations ("BP"). As a result of the BP work performance

rating, Mr. Hole placed Employee on a verbal Action Plan for Improved Performance ("APIP"). (See Employer's exhibit E at 39-40.)

An APIP serves several purposes, including the documentation of an employee's deficient work performance as well as the formulation of a strategic plan for elevating the employee's deficient performance to the expected work performance level. (See id.; Employee's response brief, exhibit E at 10.) It serves the additional purpose of informing the affected employee that if the noted deficiencies are not corrected, the employee's employment may be terminated. (See Employee's exhibit E at 10.) Indeed, an APIP may be regarded as the step immediately preceding termination of employment.

In October 1996, Mr. Hole again identified Employee's position as impacted. (See Employer's exhibit G.) Two months later, all Sandia Corporation employees, including Employee, received a letter from the corporation's president and laboratory director advising them that the United States Department of Energy approved Sandia Corporation's plan for a workplace realignment. (See Employer's exhibit H.) As part of the workplace realignment plan, Sandia Corporation offered all employees, including Employee, the opportunity to apply for a Voluntary Separative Incentive Program ("VSIP"). Employee did not apply for the VSIP. (See Employer's exhibit A at 91.)

In the course of the realignment process, various individuals at Sandia Corporation, including Mr. Hole, made numerous efforts to place Employee in another position. (See Employer's exhibit E at 41.) However, none of those efforts proved successful. (See id. at 41-42.) At the end of the realignment process, Employee's impacted position was the only position still not resolved. (See Employer's exhibit A at 91.) Concurrent with the laboratory-wide realignment process, Sandia

Corporation implemented a new job classification system, the Integrated Job Structure System ("IJS"). As a result of that process, Employee was placed at the TS 1 (MTS) level. (See Employer's exhibit J.)

In February 1997, rather than laying Employee off, Sandia Corporation's realignment board provided funding to cover up to 1,040 hours of his time to support his reassignment or retraining. (See Employer's exhibit I.) Employee was placed on a six month written APIP for the time period ranging from March 1997 through September 1997. In relevant part, the APIP: (1) documented Employee's lack of technical and project management skills, which caused him to lose work assignments; (2) listed APIP performance expectations; (3) identified training courses; (4) outlined steps for improvement; and (5) specified consequences of non-improvement. Employee's primary task under the APIP was to find another job outside of the Department, because there was insufficient work for him to perform in areas where Mr. Hole felt he could contribute. (See Employer's exhibit A at 125 and exhibit E at 38.)

During the first written APIP period, Mr. Hole met with Employee on a weekly basis to review his progress. (See Employer's exhibit E at 65.) Mr. Hole documented each performance review in a monitor schedule. (See id.; Employer's exhibit I.) Mr. Hole noted in the August 1997 monitor schedule that Employee exhibited insufficient progress in his work performance for 21 of 26 weeks and exhibited a decline in his work performance for 2 of the 26 weeks. (See Employer's exhibit I.) Factors contributing to Employee's unsatisfactory assessment were his: (1) failure to meet the deadline for an analysis of two magnetic devices and failure to provide a usable analysis; (2) failure to timely complete a feasibility study; (3) requiring excessive oversight and direction; and (4) poor organizational and presentation skills.

In August 1997, Mr. Hole conducted a "final warning" meeting with Employee. (See Employer's exhibit K.) In that meeting, Mr. Hole counseled Employee regarding his failure to meet the performance expectations set forth in the APIP and instructed him to take a "decision making" leave day to decide if he wished to continue his employment with Sandia Corporation and meet the performance expectation level of a technical staff member. After taking the day of leave, Employee advised Mr. Hole that he wanted to continue working for Employer and that he hoped to make sufficient improvements to continue working at his employment level. At that time, Mr. Hole reminded Employee that if he failed to meet the performance objectives established for him, his employment could be terminated.

Two weeks later, Employee met with Mr. Hole for an annual performance review meeting for the time period ranging from July 1996 through June 1997. (See Employer's exhibit I.) During that meeting, Mr. Hole advised Employee that his performance for the review period was rated as "unsatisfactory" because of his failure to meet the expectations outlined in the APIP. The APIP performance period ended on September 10, 1997. (See Employer's exhibit L.) Because Employee's work performance had not improved to meet the performance expectations outlined in the APIP, Employee was demoted from the position of an SMTS to the position of a Senior Technical Associate ("STA"), effective September 12, 1997. (See Employer's exhibit M.) Employee's demotion translated to the position of a Senior Technologist ("STNG") in the IJS job restructure.

Employee was placed on a second written APIP for the time period ranging from September 1997 to December 1997. (See Employer's exhibit N.) Mr. Hole continued to hold weekly status meetings with Employee throughout the duration of the second APIP. (See Employer's exhibit O.) Employee failed to meet the expectations established in the second written APIP for the following

reasons: (1) he was unable to commit to a reasonable time for completion of a technologist project; (2) he issued correspondence erroneously indicating that certain laboratory material could be discarded, which concerned other members of the Department; and (3) he failed to accept new work. (See Employer's exhibit O.) Rather than recommending termination at the end of the APIP period, Mr. Hole extended the second APIP for six weeks to allow Employee another opportunity to demonstrate satisfactory performance at the STNG level. (See id.; Employer's exhibit P.)

The third and final written APIP endured for the time period ranging from January 1998 through March 1998. (See Employer's exhibit Q.) At the end of that period, Mr. Hole determined that Employee had failed to meet the APIP's objectives for the following reasons: (1) he failed to perform at the STNG level in terms of both the quantity and quality of his work; (2) he failed to provide required schedules and progress records; and (3) he failed to accept and execute multiple job assignments concurrently without excessive supervision. Because of those failures, Mr. Hole recommended that Employee's employment be terminated. (See Employer's exhibit E.) Notwithstanding his recommendation, Mr. Hole made a final attempt to identify another job for Employee with Employer at the Technologist ("TNG") level. Mr. Hole's attempt proved unsuccessful, however, because there were no TNG-level jobs available at that time.

On May 4, 1998, Mr. Hole informed Employee that he was immediately relieved of his duties because he had failed to meet the conditions set forth in the four APIPs. (See Employer's exhibit R.) Mr. Hole provided Employee with the option of retiring, resigning, or being fired. (See Employer's exhibit E.) Employee declined to resign or retire, so his employment was terminated. (See Employer's exhibit S.)

Following the termination of his employment, Employee's job was not filled. (See Employer's exhibit E; Employee's exhibit C.) Instead, two or three days' worth of technologist-level work that Employee had performed was assigned to Angela Stewart, who was then in her mid to late 30s and worked at the STNG level. (See Employee's exhibit C.) Another portion of the work that Employee had performed was assigned to Ken Marx, who was then 61 years of age and worked at Lawrence Livermore Laboratories at the PMTS level.

On July 8, 1998, Employee filed a charge of age discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging *inter alia* that Employer terminated his employment because of his age, then 67 years. (See Employee's complaint at 2.) The EEOC issued Employee a right to sue letter in March 2000. Employee filed this lawsuit less than three months later, seeking redress under the Age Discrimination in Employment Act ("Act") and the common law of the State of New Mexico.

## II.
## STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In evaluating a motion for summary judgment, the court views the evidence and draws all reasonable inferences therefrom in the light most favorable to the nonmoving party. See Martin v. Kansas, 190 F.3d 1120, 1129 (10th Cir. 1999). However, it is "not required to evaluate every conceivable inference which can be drawn from evidentiary matter, but only reasonable ones." Lucas v. Dover Corp., 857 F.2d 1397, 1401 (10th Cir. 1988).

The party moving for summary judgment bears the burden of showing that no genuine issue of material fact exists.  See Adams v. American Guarantee and Liability Ins. Co., 233 F.3d 1242, 1246 (10th Cir. 2000); Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 670 (10th Cir.1998) (stating that moving party may satisfy its burden by "pointing out to the court a lack of evidence for the nonmovant on an essential element of the nonmovant's claim.").  Once the movant meets its burden, the nonmovant must identify evidence that would enable a trier of fact to find in the nonmovant's favor.  See Thomas v. Wichita Coca-Cola Bottling Co., 968 F.2d 1022, 1024 (10th Cir. 1992).  The evidence presented at the summary judgment stage need not be produced in a form that would be admissible at trial, so long as the "content or substance of the evidence" is admissible.  See Wright-Simmons v. City of Oklahoma City, 155 F.3d 1264, 1268 (10th Cir.1998).

### III.
### DISCUSSION

## A.     TIMELINESS OF CLAIMS

The issue is whether Employee may seek redress against Employer for discriminatory conduct that allegedly took place before September 11, 1997, which precedes the filing of Employee's EEOC complaint by 300 days.[1]  In New Mexico, a complainant generally must file a charge of age discrimination with the EEOC within 300 days of the aggrieved conduct.  See Aronson v. Gressly, 961 F.2d 907, 910 (10th Cir. 1992) (ruling that a complainant in a state that has a statute prohibiting

---

[1]  Employer moves for summary judgment on all of Employee's claims that precede July 8, 1997, rather than all of his claims that precede September 11, 1997.  See Employer's opening brief at 7.  The discrepancy between the two dates stems from the fact that Employer misstates that Employee filed his EEOC complaint on May 4, 1998, when in fact he did not file his EEOC complaint until July 8, 1998.  Thus, in order to properly determine the cut-off date applicable to Employee's claims in this case, the Court must subtract 300 days from July 8, 1998, which translates to September 11, 1997.  See Bennett v. Quark, Inc., 258 F.3d 1220, 1225 (10th Cir. 2001) (recognizing that the cut-off date for the Act's limitations period is determined by subtracting 300 days from the date upon which the plaintiff filed a discrimination charge with the EEOC); Deflon v. Danka Corp. Inc., 1 Fed.Appx. 807, 813, 2001 WL 13260, *4 (10th Cir. 2001) (same).

age discrimination in employment must file a charge with the EEOC within 300 days of the accrual of the claim); NMSA 1978, § 28-1-7 (1969) (prohibiting age discrimination in employment); see also EEOC v. Commercial Office Products Co., 486 U.S. 107, 110 (1988) (ruling that a plaintiff who institutes proceedings with a state agency authorized to grant relief from the practice charged has 300 days within which to file a complaint with the EEOC); Sabella v. Manor Care, Inc., 915 P.2d 901, 904 (N.M. 1996) (ruling that a complaint filed with the EEOC is deemed to have been properly filed with the New Mexico Human Rights Division).

Employee attempts to avoid the Act's limitations period by invoking the "continuing violation doctrine." Under that doctrine, a plaintiff may seek redress for incidents that occurred outside of the Act's limitations period if at least one instance of the aggrieved conduct occurred within that period and the earlier incidents constitute a "continuing pattern of discrimination." Furr v. AT&T Technologies, Inc., 824 F.2d 1537, 1543 (10th Cir. 1987). In determining whether the prior incidents of alleged age discrimination constitute a continuing pattern of age discrimination, the court must consider three factors: (1) subject matter–whether the violations constitute the same type of discrimination; (2) frequency; and (3) permanence–whether the nature of the violations should trigger an employee's awareness of the need to assert his or her rights. See Martin v. Nannie and the Newborns, Inc., 3 F.3d 1410, 1415 (10th Cir. 1993) (decided in the context of a Title VII claim); see also Bruno v. Western Elec. Co., 829 F.2d 957, 960, fn. 1 (10th Cir. 1987) (ruling that courts may "refer to interpretations of provisions in Title VII for assistance in defining analogous sections of the ADEA.").

The continuing violation doctrine is predicated upon the equitable principle that a statute's limitations period should not begin to run until a reasonable person would be aware that his or her

rights have been violated.  See Martin, 3 F.3d at 1415.  Thus, if an event or series of events would have alerted a reasonable person to assert his or her rights at the time of the alleged violation, the employee cannot later rely upon the continuing violation doctrine to overcome the Act's requirement of filing a charge with the EEOC with respect to that event or series of events.  See id.; see also Bullington v. United Air Lines, Inc., 186 F.3d 1301, 1311 (10th Cir. 1999) (stating that "a continuing violation claim will likely fail if the plaintiff knew, or through the exercise of reasonable diligence would have known, she was being discriminated against at the time the earlier events occurred.").

Employer claims that Employee should not be allowed to invoke the continuing violation doctrine, because he has admitted that throughout his employment he felt discriminated against because of his age.  Employer points out that as early as 1976, Employee opined he was the victim of age discrimination:

> Q:  Okay.  But my question, Mr. Ellison, is between 1976 and 1978 is it your contention that you experienced any age discrimination at Sandia?
>
> A:  I felt it was on all the time.

Employer's exhibit A at 25.

Employee based his opinion on Employer's practice of placing new hires on a scatter gram as a means of documenting each employee's progress within the organization.[2]  As Employee stated in his deposition:

> A:  . . .  I believe Sandia has always been age sensitive to everybody.  I believe everybody who gets in their 50's begins to feel the pressure of age discrimination, perhaps primarily because of that percentile, totally age

---

[2]  The Court notes that Employee has not asserted a pattern-or-practice claim modeled on International Brotherhood of Teamsters v. United States, 431 U.S. 324 (1977).  Therefore, the Court limits its analysis in this Opinion to Employee's individual claim of age discrimination.  Cf. Thiessen v. General Electric Capital Corp., 267 F.3d 1095, 1105 (10th Cir. 2001).

> discriminatory system they have of putting a person in a percentile position
> from which they can never get out.

Id. at 88.

Employee specifically opined he was the victim of age discrimination in 1982, when he was

denied a managerial promotion:

> Q:    Okay.  But there weren't any managerial promotion type positions that you
> didn't receive other than the one in 1982 to 1983; is that correct?
>
> A:    Well, that was the only one I felt comfortable in going after.  And then, when
> Dave Palmer–when I reflected on what he had said, I said, you know, what's
> the use of wasting my time, you know?  Sandia has locked me into a position
> I cannot get out of.  I can't even get a decent raise, much less a promotion.
> That was age discrimination, period.
>
> Q:    So you didn't apply for any other managerial positions other than the one in
> '82 and '83; is that correct?
>
> A:    No.  I don't beat my head against a brick wall just because it feels good when
> I stop.

Id. at 20-21.

Employee testified at his deposition that the age discrimination he felt since rejoining

Employer in 1976 persisted through the date he was fired.  In particular, he testified that from the

date Mr. Hole became his manager, May 1995, to the date his employment was terminated, March

1998, he felt discriminated against because of his age:

> Q:    Is it your belief, then, Mr. Schmitt took action [in March 1997] to
> intentionally discriminate against you on the basis of your age?
>
> A:    He had already done that.
>
> Q:    And what action do you contend Heinz Schmitt took to intentionally
> discriminate against you on the basis of your age?
>
> A:    Well, there seemed to be a concerted effort when Jim [Hole] took over T.J.
> Williams' job [in May 1995], a concerted effort from day one until the day I

was terminated [in March 1998] to engineer me into a position in which they could terminate me.

Id. at 90-91.

Employee specifically recalled that in early 1996, Mr. Hole allegedly put him on notice that he would be fired before reaching the age of 70. According to Employee:

Q:      Do you recall a subsequent conversation [in 1996] with Mr. Hole during your PMF on that point [i.e., when Employee intended to retire]?

A:      Yeah. I was kind of surprised to hear Jim [Hole] say, "You're not going to work here–you can't expect to work here when you're 70." "You're not going to work here when you're 70," I think were more exactly the words. . . .

                                        . . .

Q:      Do you recall what context the comment was made in?

                                        . . .

A:      Well, he was putting me on notice, I guess, that I wasn't going to be working there when I'm 70.

Id. at 246-47.

Employee has admitted that throughout his employment he felt discriminated against because of his age, and he has mentioned several specific incidents that supported his feeling. In doing so, Employee has shown that he was either on actual notice or on inquiry notice of the need to assert his rights. Consequently, the continuing violation doctrine, which is predicated upon the equitable notion that the "clock" should not begin to run on a plaintiff's claim until a reasonable person would be aware that his or her rights have been violated, is not applicable in this case. See Bennett, 258 F.3d at 1227 (concluding that the "permanence" factor may, by itself, prove fatal to a plaintiff's continuing violation claim); Bullington, 186 F.3d at 1311, fn. 4, *citing* Selan v. Kiley, 969 F.2d 560, 565 (7th

12

Cir.1992) (stressing the significance of the "permanence" factor in a continuing violation analysis); Holmes v. Regents of Univ. of Colo., 176 F.3d 488, 1999 WL 285826, *4 (10th Cir. 1999) (unpublished opinion) (refusing to apply the continuing violation doctrine where plaintiff "specifically admitted she was convinced the [employer] was discriminating against her as early as March 1993, but she did nothing to assert her rights at that time.").

In response, Employee states, without citation to the record, that comments were made about his receding hairline, frequent inquiries were made into when he intended to retire by unnamed co-workers, and a cartoon that derogatorily referenced him was posted on his window. See Employee's response brief at 8. Employee claims that each of those occurrences were subtle and did not impress upon him that he was unequivocally the victim of discrimination.

Employee has not directed the Court's attention to the portions of the record that support his factual claims, so the incidents noted above are not properly before the Court. However, assuming that the above incidents did in fact occur, Employee's perception of them as "subtle acts" does nothing to contradict his specific admissions that throughout his employment he felt discriminated against because of his age. Employee has therefore failed to raise a genuine issue of material fact on this issue. Accordingly, Employee may not invoke the continuing violation doctrine in this case.

**B.    DISPARATE TREATMENT**

### 1.    *Prima Facie* Case

The issue is whether Employee has satisfied his initial burden of establishing a *prima facie* case that Employer discriminated against him because of his age. See Sanchez v. Denver Public Schools, 164 F.3d 527, 531 (10th Cir. 1998) (stating that the plaintiff in an ADEA case "bears the initial burden of setting forth a *prima facie* case of discrimination."). In order to establish such a

case, Employee must show that: (1) he was at least 40 years of age; (2) he was qualified for his job; (3) despite his qualifications, he suffered an adverse employment action; and (4) his job was not eliminated after the adverse action was taken against him. See Munoz v. St. Mary-Corwin Hosp., 221 F.3d 1160, 1165 (10th Cir. 2000). Because this case involves, in part, a reduction in Employer's workforce, Employee may in the appropriate circumstances satisfy the fourth element of the *prima facie* case by showing that he "was treated less favorably than younger employees during the reduction-in-force." Ingels v. Thiokol Corp., 42 F.3d 616, 621 (10th Cir. 1994).

### a)    Adverse employment actions

Employee must establish as part of his *prima facie* case that he suffered an adverse employment action. See Munoz, 221 F.3d at 1165. An employer's conduct amounts to an adverse employment action if it "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Sanchez, 164 F.3d at 532, *quoting* Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 761 (1998). However, "a mere inconvenience or an alteration of job responsibilities" does not amount to an adverse employment action. See Sanchez, 164 F.3d at 532 (internal quotation omitted).

Employee seeks redress against Employer for three adverse employment actions which, if supported by substantial evidence, satisfy the standard set forth in the Sanchez case: (1) denial of a managerial promotion for which he applied in the 1982 fiscal year; (2) demotion from the position of SMTS to the position of STNG on September 12, 1997; and (3) termination of his employment on March 4, 1998. The Court will consider in turn the merits of each asserted adverse employment action.

14

**1)    promotion**

Employer moves for summary judgment on Employee's "failure to promote" claim on the ground that it is time-barred. See Employer's opening brief at 12; see generally Employee's response brief (failing to directly address Employer's argument on this point). The Court addressed this issue in Section A of this Opinion, holding that Employee cannot recover for discriminatory conduct that allegedly took place before September 11, 1997. Employee's contention that he was improperly denied a managerial promotion in the 1982 fiscal year will therefore be dismissed as untimely.

The managerial promotion Employee failed to receive in 1982 apparently is the only promotion for which he applied. See Employer's exhibit A at 20 (admitting that he did not apply for any promotion other than the noted managerial promotion). That being the case, Employer is entitled to summary judgment on any grievance Employee asserted or intended to assert in his failure to promote claim. See Bennett, 258 F.3d at 1228 ("To establish a *prima facie* case for failure to promote, plaintiff must show, among other things, that she applied for--or at least sought--the position at issue.").

**2)    demotion**

Employer moves for summary judgment on Employee's demotion claim in which Employee alleges that he was improperly demoted from the position of SMTS to the position of STNG on September 12, 1997. See Employer's opening brief at 13-14; Employee's response brief at 6. In support of its motion for summary judgment on this issue, Employer argues that: (a) Employee was not qualified for the position at issue, and (b) the job from which Employee was demoted was eliminated. See Jones v. Denver Post Corp., 203 F.3d 748, 753 (10th Cir. 2000) (stating that in order

to establish a *prima facie* case of discriminatory demotion, a plaintiff must show *inter alia* that he was qualified for the position at issue and that the job from which he was demoted was not eliminated).

### (a)  qualifications

Employer, relying upon Employee's employment records and Mr. Hole's deposition testimony, claims that Employee was not qualified for the SMTS position.[3]  Mr. Hole placed Employee on a written APIP for the time period ranging from March 1997 through September 1997, because Employee had demonstrated a lack of technical and project management skills, both of which are requirements of an SMTS-level employee.  The APIP listed concrete performance expectations, identified required training courses, outlined definitive steps for improvement, and specified consequences of non-improvement.  Employee's primary task under the APIP was to find another job outside of the Department, because there was not enough SMTS-level work for him to perform in areas where Mr. Hole felt he could contribute.

The monitor schedule used by Mr. Hole to document Employee's progress indicates that Employee failed to meet the objectives set forth in the APIP, including the APIP's primary objective that he locate sufficient work to sustain his position as an SMTS.  Based on Employee's failures, Mr. Hole concluded that Employee was not qualified to retain the position of SMTS and therefore demoted him to the position of STNG.  See Employer's exhibit E at 20 ("[H]is performance was not

---

[3] Employee argues that Employer cannot rely upon his employment records to support its summary judgment motion because the records are inadmissible hearsay evidence. See, e.g., Employee's response brief at 6.  Employee's argument is rejected on the ground that Mr. Hole prepared the records and is competent to testify about the matters asserted in those records.  See Wright-Simmons, 155 F.3d at 1268 (ruling that at the summary judgment stage evidence need not be produced in a form that would be admissible at trial, so long as the content or substance of the evidence is admissible).  Alternatively, Employee's argument is rejected on the ground that Mr. Hole executed an affidavit stating that he contemporaneously prepared the records for Employer, that the records are kept in the course of a regularly conducted business activity, and that it is the regular practice of Employer to make and keep such records.  See Employer's reply brief, exhibit T.  Accordingly, the records at issue fall under the business records exception to the hearsay rule and are therefore properly before this Court.  See Fed.R.Evid. 803(6) (setting forth the business records exception to the hearsay rule); Wright v. Wyandotte County Sheriff's Dept., 963 F.Supp. 1029, 1035 (D.Kan. 1997).

adequate to bring in the funding necessary to keep him as an employee, as a member of technical staff."). Such evidence sustains Employer's claim that Employee was not qualified for the position from which he was demoted. See Jones, 203 F.3d at 753.

In response, Employee claims that the Court cannot hold as a matter of law that he failed to meet the APIP's objectives, because the monitor schedule used to document his work performance is contradictory. See Employee's response brief at 6. In support of his claim, Employee points out that the "typed portion indicates that the performance objective[s] are being met" and the "handwritten portion agrees in parts and disagrees as to other parts of the 'evaluation.'" Id. The argument is disingenuous. Employee typed the "self-evaluation" portion of the monitor schedule and Mr. Hole handwrote the "supervisor evaluation" portion of the monitor schedule. The monitor schedule is therefore not contradictory as Employee is the only one who concluded he was meeting necessary objectives. It is Mr. Hole's assessment of Employee's work performance that controls the issue of whether Employee fulfilled the APIP's objectives, not Employee's subjective evaluation of his own performance. See Jones, 203 F.3d at 754 ("It is the manager's perception of the employee's performance that is relevant, not plaintiff's subjective evaluation of his own relative performance."); Young v. Cobe Laboratories, Inc., 141 F.3d 1187, 1998 WL 184449, *4 (10th Cir. 1998) (unpublished opinion) (rejecting plaintiff's assertion that her job performance was satisfactory, where documentary evidence in the record was "replete with sustained criticism of [plaintiff's] negative attitude and deficient job performance.").

Employee also claims there is a factual issue of whether he failed to meet the APIP's objectives. See Employee's response brief at 5. Employee argues that although his employment records state that he failed the first written APIP, those records are inconsistent with and are

contradicted by Mr. Hole's deposition testimony. Employee supports his argument by pointing out that Mr. Hole testified that Employee's projects always "worked" and that Employee obtained a grade of 90% in the circuit design course he was required to take under the APIP, the implications being that Employee was performing well in his job and that he had fulfilled the APIP's objectives.

Employee takes Mr. Hole's deposition testimony of out context. <u>See</u> Employer's exhibit E at 43-44 and exhibit U at 50. Although counsel for Employee did elicit from Mr. Hole that Employee's projects always functioned properly, Mr. Hole explained why he nevertheless remained critical of Employee's work performance:

Q:    But it [Employee's electrical design work] worked?

A:    Yes, it did.

Q:    Was it reliable?

A:    But in terms of our design needs, there is a question about availability of components and what should be used.

. . .

Q:    How did you come to decide that the designs could be updated in terms of the circuitry of the products involved?

A:    One of the questions was how to get [Employee] to have a skill set that could make him a full-time employee of the firing set group. And there is much more electrical design work than there is magnetic modeling, and I wanted to try to bring his skills in that area up to the point that he could be adequate and compete with his peers.

Q:    And what was the remedy to bring him up to snuff?

A:    The immediate remedy that I could bring in was to assign him to take a course at the University of New Mexico.

Employer's exhibit E at 43-44.

Counsel for Employee followed up Mr. Hole's testimony by eliciting from Mr. Hole that Employee had successfully completed all of the coursework assigned to him in the APIP. See id.; see also Employer's exhibit U at 50. However, Mr. Hole subsequently explained why completing the coursework at the University of New Mexico was not tantamount to fulfilling the APIP's objectives:

> Q: Why didn't you just say, okay, he's done the things that he's done, I'm just going to back off. He's performing adequately. Why didn't you come to that conclusion?
>
> A: You said two things. You said, he's done the things that were required in the APIP. He has done the coursework that was required in the APIP, but it was not the primary objective of the APIP, and it was not the outcome of the APIP that was – Taking the coursework was not an adequate outcome of the APIP. An adequate outcome of the APIP was that his performance and abilities got up to a level where we could continue to employ him as a senior member of technical staff in the firing set group.

Employer's exhibit U at 50.

Based on the foregoing evidence, the Court concludes that Employer has established that Employee was not qualified for the SMTS position at the time of his demotion. While Employee may disagree with the APIPs' summary of his work deficiencies and Mr. Hole's assessment of his overall work performance, Employee admits that he failed to find sufficient work to sustain his position in the Department, which was the primary task assigned to him under the APIP. Furthermore, Mr. Hole's assessment of Employee's work performance controls the issue of whether Employee was qualified for the SMTS position, not Employee's subjective evaluation of his own performance. See Jones, 203 F.3d at 754; see also Young, 141 F.3d at 1187, 1998 WL at *4. Accordingly, Employee has failed to meet his burden of showing that he was qualified for the SMTS position.

**(b)** **Job Elimination**

Employer advances a second reason why Employee's demotion claim must be dismissed on summary judgment. Employer claims that after Employee was demoted the SMTS position formerly held by him was not filled. See Employee's opening brief at 14 ("Plaintiff also cannot meet the fourth element of the *prima facie* showing: that the job from which he was demoted was not eliminated."). Employer's claim is supported by Employee's employment record, which indicates that as early as February 1996 there was not enough funding provided to the Department to support Employee's position as an SMTS. See Employer's exhibit C. That claim also is supported by Mr. Hole's deposition testimony:

Q: Now, Mr. Ellison's [SMTS] position, why was that targeted?

A: Because that was a position which we did not need on a full-time basis, and we were unable to bring in enough work to keep that position funded.

Employer's exhibit E at 10.

In response, Employee argues that there is a factual issue of whether his SMTS position was eliminated after he was demoted, because his "work was parceled to two people [Ms. Stewart and Mr. Marx] after his termination." Employee's response brief at 2-3. That argument must be rejected on two independent grounds.

First, Ms. Stewart and Mr. Marx were not given any of Employee's work when he was demoted from an SMTS to an STNG. Rather, by Employee's own admission, they were given some of his work after his employment was terminated. Employee was classified as and was performing the work of an STNG, not an SMTS, at the time his employment was terminated. Thus, Ms. Stewart and Mr. Marx did not perform any of Employee's SMTS-level work, because Employee was not an SMTS when his employment was terminated. Employee's claim that his SMTS position was filled upon his demotion has no basis in fact, and it must therefore be rejected on that ground.

20

Second, even assuming that some of Employee's SMTS-level work was parceled to Ms. Stewart and Mr. Marx upon his demotion, such conduct does not support his contention that he was replaced. Ms. Stewart already was employed by Employer, and she performed only two to three days' worth of work that had been performed by Employee. Mr. Marx already was employed by Lawrence Livermore Laboratories as a PMTS, and he performed only the analog circuitry work that had been performed by Employee. Because Employee's work responsibilities were "divided up and absorbed by . . . existing employees and no new person took over his former responsibilities[,]" his claim must be rejected. Furr v. Seagate Technology, Inc., 82 F.3d 980, 988 (10th Cir. 1996) ("The test for position elimination is not whether the responsibilities were still performed, but rather whether the responsibilities still constituted a single, distinct position."); see Godfredson v. Hess & Clark, Inc., 173 F.3d 365, 373 (6th Cir. 1999) ("[A] person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties . . ."). Furthermore, there is no evidence in the record that, unlike Employee, Ms. Stewart and Mr. Marx were then subject to the APIP process or that their work was considered deficient, so Employee cannot show that he was treated less favorably than younger, similarly situated co-workers. Cf. Ingels, 42 F.3d at 621.

**3) termination**

Employer moves for summary judgment on Employee's termination claim in which Employee argues that he was fired without cause from his STNG position. See Employer's opening brief at 14-15. In support of its motion, Employer argues that: (a) Employee was not qualified for the STNG position, and (b) Employee's STNG position was not filled after he was fired from that position. See Munoz, 221 F.3d at 1165 (stating that in order to establish a *prima facie* case of discriminatory

termination under the ADEA, the plaintiff must show *inter alia* that he was qualified for the position at issue and that the job from which he was terminated was not eliminated).

        (a)      **qualifications**

Mr. Hole placed Employee on a second written APIP for the time period ranging from September 1997 through December 1997, in order to monitor his work performance at the STNG level. The APIP listed concrete performance expectations. It also stated that Employee's progress in meeting those expectations would be assessed by whether he completed tasks at a rate consistent with that of other employees, whether he required excessive supervision, whether the quality of his work was consistent with that of other employees, and whether he accepted and carried out job assignments.

The monitor schedule used by Mr. Hole to document Employee's progress indicates that Employee failed to meet the objectives set forth in the APIP, including the APIP's critical objective that he demonstrate an ability to perform laboratory work. Despite Employee's failures, Mr. Hole did not recommend termination of his employment, but instead Mr. Hole decided to extend the second written APIP for six weeks to allow Employee another opportunity to demonstrate satisfactory performance at the STNG level. The final APIP listed the same performance expectations and contained the same measures of performance as the second written APIP.

The monitor schedule for the final APIP indicates that Employee failed to meet the objectives set forth in the APIP. In particular, the monitor schedule states that: (1) Employee failed to complete work at the pace of other STNG-level employees; (2) he failed to provide schedules and records of his progress, and (3) he failed to accept and carry out multiple job assignments without excessive supervision. Based on Employee's failures, Mr. Hole concluded that Employee was not qualified to

retain the position of STNG and therefore recommended that his employment be terminated. Such evidence sustains Employer's claim that Employee was not qualified for the position from which he was demoted. See Jones, 203 F.3d at 753.

In response, Employee claims he was discharged even though his work performance was adequate. See Employee's response brief at 4. However, Employee has not presented any evidence to support that claim nor has he presented any evidence that calls into question the evaluations made of his work performance in the monitor schedules. Instead, Employee again argues that the monitor schedules are inadmissible hearsay. The Court, having already rejected that argument, concludes that Employer is entitled to summary judgment on the termination claim because Employee's subjective evaluation of his performance has no bearing on the issue of whether he was qualified for the STNG position. See Jones, 203 F.3d at 754.

**(b)    job elimination**

Employer advances a second reason why Employee's termination claim must be dismissed on summary judgment. Employer claims that after Employee was discharged the STNG position formerly held by him was not filled by another person. See Employee's opening brief at 7 ("Following plaintiff's termination, his job was not filled."). Employer's claim is supported by Mr. Hole's deposition testimony: "When we terminated Mr. Ellison, our association with that work also quit. We did not find a replacement individual." Employer's exhibit E at 103. Employer's claim also is supported by Employee's deposition testimony:

Q:    Okay. When you were terminated by Sandia, who do you feel replaced you? Was someone hired in outside of Sandia to replace you in that position?

A:    From outside of Sandia?

Q:    Right.

A:      I don't think that I could identify anybody that got hired in from outside
        Sandia that took my position.  God help him if he did.

                                        . . .

Q:      So all the work you were doing at the time you were terminated, was a
        younger employee hired to fill that position?

A:      Or part of it because I don't think you could hire anybody to fill that position
        working 80 hours a week.  I don't know of any new employee.  Well, there
        was one new employee that was around there, but I don't think he worked in
        our department.  No.  He must have been working in the strong — I don't
        know of anybody that is a fresh new hire or they came in.

Employer's exhibit A at 238-39.

        In response, Employee claims there is a factual issue of whether his position was eliminated

after he was demoted, because his "work was parceled to two people [Ms. Stewart and Mr. Marx]

after his termination."  Employee's response brief at 2-3.  The Court has already addressed this issue,

holding that Employee was not replaced because Ms. Stewart and Mr. Marx were existing employees,

and they merely absorbed Employee's former responsibilities.  See Furr, 82 F.3d at 988; Godfredson,

173 F.3d at 373.  Furthermore, there is no evidence in the record that, unlike Employee, Ms. Stewart

and Mr. Marx were then subject to the APIP process or that their work performance was considered

deficient, so Employee cannot show that he was treated less favorably than younger, similarly situated

co-workers.  Accordingly, Employee's termination claim will be dismissed.

        **4)      preferential assignments**

        Employer moves for summary judgment on Employee's preference claim in which Employee

alleges that younger employees were given preferential work assignments.  See Employer's opening

brief at 16; Employee's response brief (failing altogether to address Employer's argument on this

issue).  In support of its motion, Employer argues that:  (a) each claim of alleged preferential

treatment asserted by Employee is time-barred, (b) the award of preferential work assignments does not constitute an adverse employment action, and (c) Employee has failed to establish that he was treated less favorably than other similarly-situated employees.  See Employer's opening brief at 16.

**(a)      time-bar**

Employee claims that Russell Humphreys, Greg Lyons, George Clark, and William Curtis were given choice work assignments that he should have received.  See Employee's complaint at 3; see also Employer's exhibit A at 239-45.  Every work assignment referred to by Employee was assigned in or before 1996, which precedes the filing of his EEOC complaint by more than 300days.  Accordingly, Employee's claim that he received less favorable assignments than his co-workers will be dismissed as untimely.  See Aronson, 961 F.2d at 910.

**(b)      actionable conduct**

Employee has not cited, and the Court has not located, any authority showing that the award of preferential work assignments constitutes an adverse employment action for which an employee may seek redress.  Cf. Sanchez, 164 F.3d at 532 (stating that adverse employment action is "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.") ("[A] mere inconvenience or an alteration of job responsibilities" is not an adverse employment action).  Accordingly, Employer is entitled to summary judgment on Employee's preference claim.

**(c)      treatment**

Even if the Court were to assume *arguendo* that an employee may seek redress against his employer for failing to receive preferential work assignments, Employee must show that he was treated less favorably than similarly situated co-workers.  See, e.g., Sprague v. Thorns Americas, Inc.,

129 F.3d 1355, 1363 (10th Cir. 1997). Employee has failed to meet his burden of showing that he was as qualified as or better qualified than Mr. Humphreys, Mr. Lyons, Mr. Clark, and Mr. Curtis for the positions at issue, because he has failed to provide any evidence of their performance, training, education, or skills. Without such evidence to buttress his claim, Employee cannot establish a *prima facie* case that he was the victim of discriminatory conduct. As the Tenth Circuit has stated:

> . . . although [Mr. Amro] has identified others who allegedly are similarly situated engineers, he has not provided any evidence of their performance, training, education or skills. [Mr. Amro's] own opinion that his performance is excellent does not raise a fact question as to how his performance compares to others.

Amro v. Boeing Co., 232 F.3d 790, 798 (10th Cir. 2000) (internal quotation omitted); see Jones, 203 F.3d at 754 (10th Cir. 2000). Accordingly, Employer is entitled to summary judgment on Employee's preference claim.

**5)       discipline**

Employer moves for summary judgment on Employee's discipline claim in which Employee alleges that he was disciplined without justification or cause. See Employer's opening brief at 18-19. In support of its motion, Employer claims there is no evidence in the record that Employee suffered an adverse employment action for violating a work rule nor is there any such evidence that he was disciplined more harshly than other employees who allegedly committed infractions of the same magnitude. See Elmore v. Capstan, Inc., 58 F.3d 525, 529 (10th Cir. 1995) (stating that in order to establish a *prima facie* case of discriminatory discipline, a plaintiff must show *inter alia* that he was disciplined for violating a work-place rule and that other employees were subject to more lenient discipline for infractions classified as comparable in seriousness).

In response, Employee argues that he was disciplined because he was placed on numerous APIPs, he was demoted, he was subjected to conclusory negative performance evaluations, and he

was fired from his work.  <u>See</u> Employee's response brief at 13.  Employee's allegations, even if true, do not constitute discriminatory disciplinary action.  As noted by Employer, Employee fails to establish that the aggrieved actions resulted from his violating a work-place rule and that the aggrieved actions amounted to disproportionately harsh treatment, both of which are elements of a discipline claim under the <u>Elmore</u> case.  <u>See</u> Employer's reply brief at 10; <u>see also</u> Employer's exhibit E at 41 (Mr. Hole stating that the APIP process did not constitute discipline in this case).  Employee's discipline claim will therefore be dismissed.

**2.    Legitimate Business Reasons**

Employee has failed to establish a *prima facie* case that Employer discriminated against him because of his age.  However, assuming *arguendo* that he had done so, Employer may rebut Employee's *prima facie* case by articulating legitimate, nondiscriminatory reasons for its employment actions.  <u>See</u> <u>Munoz</u>, 221 F.3d at 1165 (stating that if the plaintiff in an ADEA case establishes a *prima facie* case of age discrimination, the defendants "must then articulate a legitimate, nondiscriminatory reason for the adverse employment action suffered by the plaintiff.").

Employer claims, and the Court agrees, that it has articulated legitimate, nondiscriminatory reasons for each adverse employment action asserted by Employee.  In regard to the demotion claim, Employer has shown with particularity that from February 1996 through the date of Employee's demotion in September 1997, Employee's work performance as an SMTS was deficient.  Employer also has shown that during that same time period there was insufficient funding to cover Employee's full-time effort because the work he specialized in was no longer in sufficient demand.  Based on those facts, Mr. Hole demanded that Employee correct his deficiencies and bring in sufficient work to sustain his position as an SMTS.  Only after Employee failed to satisfy those demands for well over

a year was he demoted from the SMTS position to the STNG position. Accordingly, Employer has justified its decision for demoting Employee.

In regard to the termination claim, Employer has shown with particularity that from September 1997 through the date of Employee's termination in March 1998, Employee's work performance as an STNG was deficient. Employer also has shown that after Mr. Hole determined that Employee could not function at the STNG level, he attempted to find another position for Employee with Employer at the TNG level. When he was unable to locate an available position at the TNG level, Mr. Hole recommended that Employee's employment be terminated. Employer has therefore justified its decision for firing Employee.

## C.    HOSTILE WORK ENVIRONMENT

Employer moves for summary judgment on Employee's hostile work environment claim in which Employee alleges that he was harassed because of his age. <u>See</u> Employer's opening brief at 21-22; <u>see generally</u> Employee's response brief (failing altogether to address Employer's argument on this issue). In support of its motion, Employer argues that: (1) the Tenth Circuit has not recognized a cause of action for hostile work environment under the Act; and (2) the alleged discriminatory comments were stray remarks that did not alter the terms, conditions, or privileges of Employee's employment.

### 1.    Cause of Action

The Tenth Circuit has not expressly recognized a cause of action for hostile work environment under the ADEA. <u>See</u> <u>Holmes</u>, 1999 WL 285826 at *7. However, it has decided a case where the plaintiff raised the issue before the district court. <u>See</u> <u>id.</u>, *citing* <u>McKnight v. Kimberly Clark Corp.</u>, 149 F.3d 1125, 1129 (10th Cir.1998) (deciding a hostile work environment claim under the ADEA,

but not addressing the apparent lack of authority for raising such a theory). In light of the McKnight case, the Court will assume without deciding that Employee may assert a hostile work environment claim under the ADEA.

In order to prevail on a hostile environment claim, the plaintiff must show that the workplace was "permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the employment and create an abusive working environment." Penry v. Federal Home Loan Bank of Topeka, 155 F.3d 1257, 1261 (10th Cir. 1998). For purposes of evaluating whether the plaintiff's working environment was sufficiently hostile or abusive to warrant relief, the court examines: (1) the frequency of the discriminatory conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the plaintiff's work performance. See Lockard v. Pizza Hut, Inc., 162 F.3d 1062, 1072 (10th Cir. 1998). The plaintiff must establish "that the environment was both objectively and subjectively hostile or abusive." Davis v. U.S. Postal Service, 142 F.3d 1334, 1341 (10th Cir. 1998).

## 2.    Comments

The only purported discriminatory comment that allegedly was made after September 11, 1997—and, hence, the only comment properly before this Court—is Mr. Hole's statement to an unidentified person that: "A person who's not wanted ought to quit." Employer's exhibit A at 271. When Employee was asked how he knew Mr. Hole was referring to him, Employee stated in relevant part:

> A:    I didn't want to turn around and look at anybody. I just wanted to ignore it and go on, you know, but he was right behind me. There was nobody between us.

Q:     But he didn't say that using your name in any way, correct?

A:     No, no.

Id. at 271.

Assuming *arguendo* that Mr. Hole made the alleged remark and that he was referring to Employee, there is no evidence in the record that the remark altered the conditions of Employee's employment.  First, the remark stands alone as a stray remark.  Second, it is not severe in comparison with other remarks that have been dismissed by the Tenth Circuit as stray remarks.  See Lucas v. Miami County, 9 Fed.Appx. 809, 813-14, 2001 WL 497372, *4 (10th Cir. 2001) (unpublished opinion) (dismissing remark that supervisor referred to employee as "that crazy old man upstairs" as a stray remark of little probative value); Campbell v. Mart, 216 F.3d 1086, 2000 WL 826259, *2 (10th Cir. 2000) (unpublished opinion) (dismissing remark that manager commented that "poor old black woman wants to learn" as a stray remark).  Third, there is no evidence in the record indicating that the remark was anything more than an offensive utterance with no reference to age.  And fourth, there is no evidence in the record indicating that the remark interfered with Employee's work performance by causing him to feel humiliated, stressed, upset, or shocked.

Based on the foregoing, the Court concludes that Employer is entitled to summary judgment on Employee's hostile work environment claim.  See Davis, 142 F.3d at 1341-42 (ruling that plaintiff need not show that abusive work environment seriously affected her psychological well-being, but must show that she endured humiliation sufficient to alter the terms and conditions of the workplace).  Employee's hostile work environment claim will therefore be dismissed.

**D.     STATE LAW CLAIM**

Employee seeks redress from Employer for wrongful termination of employment under the common law of the State of New Mexico. <u>See</u> Employee's complaint at 6. The basis for Employee's wrongful termination claim parallels the basis for his ADEA claim. Having dismissed Employee's ADEA claim, the Court also will dismiss his wrongful termination claim.

## IV.
## CONCLUSION

For the reasons set forth above, the Court finds that the defendants are entitled to summary judgment on the plaintiff's complaint. An Order in conjunction with this Opinion will issue.

DATED at Albuquerque this 28th day of January, 2002.

_____
BRUCE D. BLACK
United States District Judge

**Attorneys:**

For Plaintiff:

      Patrick Bingham, Albuquerque, N.M.

For Defendants:

      Deborah D. Wells, Albuquerque, N.M.